IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

:

CSX TRANSPORTATION, INC.

:

v.                              : Civil Action No. DKC 2005-0419

:

TRANSPORTATION-COMMUNICATIONS
INTERNATIONAL UNION, et al.    :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in these consolidated labor dispute cases are: (a) the motions of United Transportation Union ("UTU") for summary judgment (paper 24) and for leave to file an attachment to its summary judgment motion (paper 30); (b) the motions of Transportation-Communications International Union ("TCU") for summary judgment (papers 26, 45); and (c) the motions of CSX Transportation, Inc. ("CSXT") for summary judgment (papers 27, 44).[1]  The issues are fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary.  For the reasons that follow, the court will grant TCU's motions for summary judgment; deny UTU and CSXT's motions for summary judgment; and deny, as moot, UTU's motion for leave to file an attachment.

---

[1] The court consolidated cases DKC 05-00419 and DKC 05-02511 on November 23, 2005.  Both TCU and CSXT filed initial summary judgment motions pertaining to 05-419 (papers 26 and 27, respectively), and then filed supplemental summary judgment motions following the consolidation (papers 45 and 44, respectively).

I.    Background

A.  Facts and Legal Framework

The facts underlying this case have a long and somewhat complicated history.  The Interstate Commerce Commission ("ICC"), now the Surface Transportation Board ("STB"), has exclusive jurisdiction under the Interstate Commerce Act ("ICA") to approve consolidation or merger of rail carriers.[2]  49 U.S.C. §§ 11321-27.  In 1980, CSX Corporation, acting in accordance with the ICA, sought ICC approval to acquire common control over the railroad subsidiaries of the Chessie System, Inc. (including the Baltimore and Ohio Railroad Company ("B&O")), and Seaboard Coast Line Industries, Inc. (including the Louisville and Nashville Railroad Company ("L&N") and the Seaboard Coast Lien Railroad Company ("SCL")).  The ICC approved the acquisition, subject to the New York Dock labor protective provisions ("New York Dock provisions"), which provide protections to employees who are adversely impacted by operational changes following approved consolidations.[3]  The

---

[2]  The ICC Termination Act of 1995 abolished the ICC and created the STB.  The STB then adopted the precedents and regulations of the ICC.

[3]  In *New York Dock Railway-Control-Brooklyn Eastern District Terminal*, 360 I.C.C. 60 (1979), *aff'd sub nom., New York Dock Railway v. United States*, 609 F.2d 83 (2nd Cir. 1979), the ICC interpreted the requirements of the ICA, 49 U.S.C. § 11347, now recodified at 49 U.S.C. § 11326.  The interpreted requirements are known as the "New York Dock" provisions.  *See* discussion *infra* pp. 15-16.

combined rail systems were renamed CSX Transportation, Inc. ("CSXT").

In the years following the acquisition, CSXT implemented numerous operational changes in order to capitalize on its resources and enhance its efficiency.  In 1990, CSXT initiated the consolidation of clerical functions performed throughout the CSXT system to one location in Jacksonville, Florida.  The New York Dock provisions require a railroad "contemplating a transaction which is subject to these conditions and may cause the dismissal or displacement of any employees or the rearrangement of forces" to provide advance written notice to all interested employees and their representatives.  Accordingly, on October 25, 1990, CSXT served a New York Dock notice on TCU, which represents clerks for purposes of collective bargaining.  The notice informed TCU of CSXT's intent to transfer functions performed by clerical employees at numerous "Transportation Service Centers" to a centralized Customer Service Center ("CSC") to be located in Jacksonville, Florida.

On January 29, 1991, CSXT and TCU entered into an Implementing Agreement regarding the proposed clerical function transfer, as required under the New York Dock provisions. (Joint Exhibit ("JE") 10).[4]  The Implementing Agreement first addressed the "transfer and

_____

[4] On June 23, 2005, CSXT filed notice that it would be filing lengthy exhibits on behalf of all parties. (Paper 25).  Those exhibits will be referenced as joint exhibits ("JE").

consolidation of work," and indicated that "clerical and related functions" performed by employees at the various Service Centers would be transferred to Jacksonville.[5]   The Implementing Agreement also provided detailed information about how positions would be filled at the CSC, including how seniority rights would be exercised and preserved, and time frames for employee transfers. The Implementing Agreement stipulated that "the employee protective benefits and conditions contained in the so-called 'New York Dock' will be applied to this transaction" and provided specific time frames for employees to elect between acceptance of the New York Dock protective benefits and the "protective benefits" under "other protective agreements or arrangements."  The Implementing Agreement also noted that work remaining at the Service Centers and work transferred to the CSC would continue to be performed under the respective general collective bargaining agreements ("CBAs") already in place at those locations.   Although the CSC was a new center, there was a CBA already in place for clerks in Jacksonville – the "TCU-SCL" agreement.   This agreement was to apply to the new customer service representative positions.

Following the Jacksonville consolidation, numerous disagreements arose regarding work assignments.  TCU asserted that

---

[5] The Implementing Agreement did not define "clerical and related functions," but did contain, as an attachment, a description of the new customer service representative position that included a listing of duties and rate of pay.

4

computer tasks that properly belonged to customer service representatives at the CSC were being performed by various employees at the Service Centers, including Yardmasters represented by the United Transportation Union ("UTU"), and other clerks or CSXT supervisory employees not covered by the TCU-SCL agreement. TCU maintained that this violated the TCU-SCL agreement, which contained a scope provision defining the type of employee and the work the agreement would cover, and provided that work covered by the agreement "shall not be removed from such coverage except by agreement between the General Chairman and the Director of Labor Relations." (JE 11, TCU-SCL agreement; JE 12, 1981 Amendments to TCU-SCL agreement).

### 1. The 1994 Agreement

As a result of what TCU perceived to be violations of the TCU-SCL agreement, TCU filed numerous claims pursuant to the grievance procedures in the TCU-SCL agreement.  CSXT maintained that the functions in question were "shared" functions and not exclusively within the scope of the TCU-SCL agreement.  In an attempt to settle the disputes, TCU and CSXT entered into an agreement on December 1, 1994.  The 1994 Agreement resolved the disputes at all but three locations.  At the three locations where the parties were unable to reach agreement, the 1994 Agreement stipulated that the parties would submit the outstanding disputes to binding arbitration.

**2.   The 1997 Dennis Arbitrations**

In order to resolve the outstanding disputes, CSXT and TCU established Public Law Board No. 5782.   Public Law Boards are a voluntary alternative forum for arbitrating disputes otherwise referable to the National Railroad Adjustment Board ("NRAB").   45 U.S.C. § 153 Second; *Employees Protective Ass'n v. Norfolk & W. Ry.*, 511 F.2d 1040, 1044 (4th Cir. 1975).   The arbitration awards are final and binding on the parties.   45 U.S.C. § 153 Second.   On February 14, 1997, Arbitrator Rodney E. Dennis issued five separate awards, each of which sustained TCU's position that the TCU-SCL Agreement had been violated.[6]  (JE 6, TCU ex. 22, at 40-51).   CSXT did not challenge the Dennis awards.[7]

**3.   The Benn Arbitrations**

Following the Dennis awards, CSXT and TCU continued to have disagreements pertaining to computer tasks performed by various employees in the field instead of by customer service representatives at the CSC.   TCU continued to file claims pursuant to the TCU-SCL grievance procedures but the claims were not resolved through this process.   CSXT combined multiple TCU claims into fifty-seven cases and filed them with the NRAB Third Division,

---

[6] The parties' agreement provided for a Board of three members: a carrier member, an employee member, and a neutral member.   Arbitrator Dennis was the neutral member of the Board.

[7] UTU, though not a party to the Dennis Arbitrations, also did not take any steps to challenge the awards.

which has jurisdiction over certain collective bargaining
disputes.[8]   On December 16, 2003, three members (carrier
representative Mike Lesnik, union representative William Miller,
and neutral Edwin Benn) heard oral argument on ten of the fifty-
seven cases.[9]   Both CSXT and TCU filed written submissions and
presented oral arguments at the hearings.  Because several of the
claims involved UTU-represented yardmasters performing tasks TCU
argued exclusively belonged to customer service representatives at
the CSC, UTU was considered an interested party and was given
notice of the proceeding and an opportunity to submit its position
in writing, and to present argument at the arbitration hearings.

In July 2004, Mr. Benn sent his proposed awards to both Mr.
Lesnik and Mr. Miller.  Mr. Lesnik sent an e-mail to Mr. Miller and
Mr. Benn, requesting a meeting to discuss the cases.   UTU
representative J.R. Cumby was copied on this communication.   In
response, Mr. Cumby sent an e-mail requesting he be kept informed

---

[8] The NRAB has four "Divisions."  Each has jurisdiction over
different crafts.   The Third Division has jurisdiction over
clerical employees, among others, and includes five carrier members
and five labor members.   *See* discussion *infra* pp. 13-14 for a
detailed discussion of the NRAB's jurisdiction over collective
bargaining disputes.

[9] The Railway Labor Act ("RLA") provides that any Division may
appoint two or more of its members to decide disputes, and allows
a neutral "referee" to be appointed should the members deadlock.
In practice, the decision-making board comprises three members from
its inception – one carrier representative, one labor
representative, and a neutral. (Paper 26, declaration of William
Miller, at 5).

of the meeting date so that he could stay involved.  A meeting was scheduled for September 24, 2004, and, per Mr. Cumby's request, he was informed of the meeting date, but was not personally invited to attend.  UTU maintains that after being informed of the meeting date, Mr. Cumby called Mr. Lesnik and NRAB Vice Chairperson Marty Fingerhut to inquire as to whether he could attend the meeting. UTU states that both Mr. Lesnik and Mr. Fingerhut denied his request, to which Mr. Cumby "strongly objected."  A meeting was held on September 24, 2004, in which Mr. Benn, Mr. Lesnik, and Mr. Miller discussed the proposed awards.  The awards were formally adopted by the NRAB on October 27, 2004.[10]  In eight out of the ten cases, the NRAB sustained TCU's claims and issued corresponding awards in TCU's favor.

CSXT maintains that after the Benn awards were issued, and, given the "mounting number of claims being pursued by TCU," it decided to "reexamine" the entire dispute.  In doing so, CSXT determined that the parties should have handled the claims pursuant to the exclusive dispute resolution procedures in the New York Dock provisions, and that the NRAB was without jurisdiction to resolve the disputes.  On February 11, 2005, the NRAB carrier members, including Mr. Lesnik, filed a dissent to the ten Benn awards on CSXT's behalf, echoing CSXT's assertions regarding jurisdiction.

---

[10] It is unknown what changes, if any, were made to the proposed awards as a result of the September 24, 2004, meeting, prior to their adoption by the NRAB.

### 4.  The Wesman Arbitration

Following the disputes which led to the Benn Arbitrations, there continued to be disagreements regarding work assignments. Pursuant to the grievance procedures in the SCL-TCU CBA, TCU filed a claim alleging that CSXT violated the CBA when it allowed a clerk in the field to issue "plant switching instructions," because this work must be performed by a customer service representative at the CSC.  CSXT denied the claim, and in April 2003, TCU submitted the grievance to the Third Division of the NRAB.  Arbitrator Elizabeth Wesman was appointed as the neutral member of the arbitration panel.  After the hearing but prior to the issuance of a decision, carrier member Mr. Lesnik notified Ms. Wesman of the carrier members' dissent in the Benn awards, and sought dismissal of the action for lack of jurisdiction.  This submission triggered a series of four letters to Ms. Wesman from the labor and carrier members, concerning the exact nature of the dispute.  On July 20, 2005, Ms. Wesman issued an award, in which she applied the analysis set forth in the Benn awards and sustained TCU's claim.  Arbitrator Wesman stated that the NRAB had jurisdiction and that "the Board reviewed the entire record," but otherwise did not address the jurisdictional argument.

### B.  Judicial Proceedings

On February 11, 2005, the same day the NRAB carrier dissent was filed in the Benn arbitrations, CSXT filed a petition to vacate

the ten awards in this court based on its belief that the NRAB lacked jurisdiction.  (Paper 1).  On April 22, 2005, TCU filed a counterclaim seeking to enforce the eight awards on which it prevailed. (Paper 11).  On April 28, 2005, UTU filed a cross-claim against TCU and a counterclaim against CSXT.  (Paper 12).  UTU claims that it was not, as required by the RLA, allowed to "fully participate" in the arbitration process and requests that this court either overturn the arbitration awards or issue an order compelling CSXT to rearbitrate the disputes with UTU participating as a "full member" in the arbitrations.  On June 23, 2005, UTU, TCU, and CSXT all filed motions for summary judgment. (Papers 24, 26, and 27, respectively).[11]  On July 1, 2005, UTU filed a motion for leave to attach the declaration of Mr. Cumby to the memorandum in support of its motion for summary judgment.  (Paper 30).

On September 9, 2005, in a separate case, DKC 2005-2511, CSXT filed a petition to vacate the Wesman award, on the basis that the NRAB was without jurisdiction to decide the claim.  In November 2005, the undersigned held a telephone conference with counsel, where it was determined that this subsequently filed case was related to the initial action, DKC 2005-0419.[12]  Accordingly, on

---

[11] On July 5, 2005, this court granted TCU's motion to correct its memorandum in support of its motion for summary judgment.  A corrected version was filed with this court on the same day. (Paper 32).

[12] UTU is not a party in this subsequent case.

November 23, 2005, this court issued an order consolidating the two

cases.  On December 22, 2005, both CSXT and TCU filed supplemental

motions for summary judgment.  (Papers 44 and 45, respectively).[13]

## II.  Standard of Review

This court's review of NRAB decisions is one of the "narrowest

known to law."  *Union Pac. R.R. Co. v. Sheehan*, 439 U.S. 89, 91

(1978); *Norfolk & W. Ry. Co. v. Transp. Commc'ns Int'l Union*, 17

F.3d 696, 699 (4th Cir. 1994).  The relevant statute provides:

> The court shall have jurisdiction to affirm
> the order of the division or to set it aside,
> in whole or in part, or it may remand the
> proceeding to the division for such further
> action as it may direct.  On such review, the
> findings and order of the division shall be
> conclusive on the parties, except that the
> order of the division may be set aside, in
> whole or in part, or remanded to the division,
> for failure of the division to comply with the
> requirements of this chapter, for failure of
> the order to conform, or confine itself, to
> matters within the scope of the division's
> jurisdiction, or for fraud or corruption by a
> member of the division making the order.

45 U.S.C. § 153 First(q).  Hence, a district court may set aside a

NRAB decision in only three instances – where the NRAB violated the

RLA, committed fraud, or rendered a decision outside of its

jurisdiction.  Two of these three instances are relevant in this

case.  First, CSXT asserts that the Benn and Wesman awards should

be vacated because the NRAB failed to confine itself to matters

---

[13] For purposes of clarity, filings in the subsequent case will
specifically be referenced by case DKC 2005-2511.

within its jurisdiction.  Second, UTU asks that the Benn awards be set aside based on its assertion that the NRAB violated the RLA by not allowing it the opportunity to "fully" participate.

## III.  CSXT's Jurisdictional Claim

CSXT asserts that the arbitration awards should be vacated because the NRAB exceeded the scope of its jurisdiction.  It argues that the resolution of the dispute centered on the interpretation of the 1991 New York Dock Implementing Agreement and that disputes involving New York Dock Implementing Agreements must be resolved under the New York Dock arbitration procedures and not through the NRAB process.  CSXT characterizes this issue as one of "subject matter jurisdiction."  As such, CSXT asserts that even though it brought a majority of the disputes to the NRAB in the first instance, and never once objected to the NRAB's jurisdiction during the administrative process or invoked the New York Dock procedures, it cannot be deemed to have waived the argument because issues of subject matter jurisdiction are not waivable and may be asserted at any time.[14]  TCU responds that, with regard to the Benn Awards, CSXT has waived its jurisdictional argument by not raising it before the NRAB adopted the awards, and argues that CSXT has confused waiver of an agency's jurisdiction with waiver of a federal court's subject matter jurisdiction, and that in any case, the agency

---

[14] CSXT brought the claims in the initial lawsuit to the NRAB. In the latter case, TCU filed the claim with the NRAB.

12

waiver jurisprudence has no application to the NRAB because it is not subject to the Administrative Procedure Act.

The resolution of both jurisdictional and waiver issues requires a detailed consideration of the intersection between the RLA and the ICA, including the policies Congress sought to further in enacting both of the statutes. As will be seen, the jurisdictional question is not one of the NRAB's subject matter jurisdiction, but rather more akin to personal jurisdiction or immunity. Because CSXT certainly has not properly invoked the jurisdiction of the STB by claiming an exemption from NRAB's authority, it has waived its right to invoke the New York Dock provisions as to these disputes. Moreover, the court also concludes that the NRAB did not act in excess of its jurisdiction. The court, thus, will deny CSXT's request to vacate the awards.

## A.   The Railway Labor Act and the NRAB

The RLA grants the NRAB exclusive jurisdiction to resolve "disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of interpretation or application of agreements concerning rates of pay, rules, or working conditions." 45 U.S.C. § 153 First(i). Such disputes are commonly referred to as "minor disputes," those that "may be conclusively resolved by interpreting the existing [collective bargaining] agreement." *Consol. Rail Corp. v. Ry. Labor*

*Executives' Ass'n*, 491 U.S. 299, 305 (1989).[15]   In *Sheehan*, the Supreme Court articulated the policies underlying the RLA and the establishment of the NRAB:

> In enacting this legislation, Congress endeavored to promote stability in labor-management relations in this important national industry by providing effective and efficient remedies for the resolution of railroad-employee disputes arising out of the interpretation of collective-bargaining agreements. *See Gunther v. San Diego & A. E. R. Co.,* [382 U.S. 257 (1965)]; *Union Pacific R. Co. v. Price*, [360 U.S. 601 (1959)]; *Slocum v. Delaware, L. & W. R. Co.*, 338 U.S. 239, 70 S.Ct. 577, 94 L.Ed. 795 (1950).   The [NRAB] was created as a tribunal consisting of workers and management to secure the prompt, orderly and final settlement of grievances that arise daily between employees and carriers regarding rates of pay, rules and working conditions. . . .   The effectiveness of the [NRAB] in fulfilling its task depends on the finality of its determinations.

*Sheehan*, 439 U.S. at 94.

## B.  The Interstate Commerce Act and the STB

Congress has vested with the STB, "the exclusive authority to examine, condition, and approve proposed mergers and consolidations." *Norfolk & W. Ry. Co. v. Am. Train Dispatchers*

---

[15] In contrast, "major disputes" relate to the formation of collective bargaining agreements that do not exist, or efforts to change the terms of an existing agreement. Major disputes "look to the acquisition of rights for the future, not to the assertion of rights claimed to have vested in the past." *Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711, 723 (1945).   Major disputes are resolved through a long and arduous process of bargaining and mediation. *See Detroit & T.S.L.R. Co. v. United Transp. Union*, 396 U.S. 142, 149 (1969).

*Ass'n*, 499 U.S. 117, 119 (1991).  The STB is also tasked with ensuring that "the employees of the affected rail carrier will not be in a worse position related to their employment as a result of the transaction."  49 U.S.C. § 11326.  As noted, the New York Dock provisions are recognized as the agency's fulfillment of its obligations under § 11326.  The provisions contain both substantive and procedural requirements that railroads must meet to ensure that employees impacted by mergers and consolidations are protected.  For example, the New York Dock provisions require railroads to preserve "displaced employees' pay, working conditions, benefits, and rights to collective bargaining."  *CSX Transp., Inc. v. United Transp. Union*, 86 F.3d 346, 349 (4th Cir. 1996).

With regard to procedural requirements, Article I, § 4 of the New York Dock provisions states that a railroad contemplating an operational change that may result in dismissal, displacement, or rearrangement of employees, must provide ninety days written notice of its intent to interested employees and their representatives.  *New York Dock*, 360 I.C.C. at 85.  The parties are then required to negotiate and come to an agreement regarding how the mandatory protective provisions will be implemented.  If the parties cannot reach an implementing agreement within thirty days, the parties must submit the dispute to arbitration in accordance with the procedures set forth in § 4.  *See CSX Transp., Inc. v. United Transp. Union*, 86 F.3d at 348 (noting that arbitration under § 4 is

15

mandatory).    Article  I,  §  11  further  provides  for  mandatory arbitration "in the event the railroad and its employees or their authorized   representatives   cannot   settle   any   dispute   or controve[r]sy with respect to the interpretation, application or enforcement of any provision of [the New York Dock requirements]. *New York Dock*, 360 I.C.C. at 87.[16]

## C.  The Intersection of the RLA and the ICA.

The ICA provides, in relevant part:

> The   authority   of   the   [STB]   under   this
> subchapter is exclusive. . . . A rail carrier,
> corporation, or person participating in [the]
> approved  or  exempted  transaction  is  exempt
> from  the  antitrust  laws  and  from  all  other
> law,  including  State  and  municipal  law,  as
> necessary   to   let   that   rail   carrier,
> corporation,   or   person   carry   out   the
> transaction,  hold,  maintain,  and  operate
> property,  and  exercise  control  or  franchises
> acquired through the transaction.

49 U.S.C. § 11321(a).  The purpose of this provision, and the exemption from antitrust and other laws that it provides, is to ensure that efforts to merge and consolidate are not obstructed, and that merger efficiencies can be achieved.  *Train Dispatchers*, 499 U.S. at 133.   In *Train Dispatchers*, the Supreme Court interpreted § 11321(a), concluding that "other law" may include

---

[16] Either party can appeal a § 4 or § 11 arbitration decision to the STB, *see* 49 C.F.R. § 1115.8, and, pursuant to 28 U.S.C. § 2321, the STB's decision is subject to review by the appropriate United States Court of Appeals.

both the provisions of the RLA and even existing CBAs, assuming the necessity prerequisite is met.  The court stated:

> [T]he RLA is the law that, under § 11341(a) [recodified at § 11321(a)], is superceded when an ICC-approved transaction requires abrogation of collective-bargaining obligations. . . .  Our determination that [§ 11321(a)] supercedes collective-bargaining obligations via the RLA as necessary to carry out an ICC-approved transaction makes sense of the consolidation provisions of the Act, which were designed to promote "economy and efficiency in interstate transportation by the removal of the burdens of excessive expenditure." *Texas v. United States*, 292 U.S. 522, 534-535, 54 S.Ct. 819, 825, 78 L.Ed. 1402 (1934). . . . [T]he Act imposes a number of labor-protecting requirements to ensure that the Commission accommodates the interests of the affected parties to the greatest extent possible. . . . Section [11321(a)] guarantees that once these interests are accounted for and once the consolidation is approved, obligations imposed by laws such as the RLA will not prevent the efficiencies of consolidation from being achieved.  If [§ 11321(a)] did not apply to bargaining agreements enforceable under the RLA, rail carrier consolidations would be difficult, if not impossible, to achieve.  The resolution process for major disputes under the RLA would so delay the proposed transfer of operations that any efficiencies the carriers sought would be defeated.  *See e.g., Burlington Northern R. Co. v. Maintenance of Way Employes*, 481 U.S. 429, 444, 107 S.Ct. 1841, 1850, 95 L.Ed.2d 381 (1987) (resolution procedures for major disputes "virtually endless"); *Detroit & T. S. L. R. Co. v. United Transportation Union*, 396 U.S. 142, 149, 90 S.Ct. 294, 298, 24 L.Ed.2d 325 (1969) (dispute resolution under the RLA involves "an almost interminable process"); *Railway Clerks v. Florida East Coast R. Co.*, 384 U.S. 238, 246, 86 S.Ct. 1420, 1424, 16 L.E.2d 501 (1966) (RLA procedures are "purposely long and drawn

17

> out"). The immunity provision of [§ 11321(a)]
> is designed to avoid this result.

*Train Dispatchers*, 499 U.S. at 132-33. The court concluded: "We

hold that, *as necessary* to carry out a transaction approved by the

Commission, the term 'all other law' in [§ 11321(a)] includes any

obstacle imposed by law." *Id*. at 133 (emphasis added).

**D. Analysis**

**1. Subject Matter Jurisdiction - Waiver**

CSXT contends that the NRAB, like federal courts, is a

tribunal of limited jurisdiction and cannot exceed that

jurisdiction even with consent of the parties. It is, of course,

axiomatic that:

> Federal courts are not courts of general
> jurisdiction; they have only the power that is
> authorized by Article III of the Constitution
> and the statutes enacted by Congress pursuant
> thereto. *See, e.g., Marbury v. Madison*, 1
> Cranch (5 U.S.) 137, 173-180, 2 L.Ed. 60
> (1803). For that reason, every federal
> appellate court has a special obligation to
> "satisfy itself not only of its own
> jurisdiction, but also that of the lower
> courts in a cause under review," even though
> the parties are prepared to concede it.
> *Mitchell v. Maurer*, 293 U.S. 237, 244, 55
> S.Ct. 162, 165, 79 L.Ed. 338 (1934). *See
> Juidice v. Vail*, 430 U.S. 327, 331-332, 97
> S.Ct. 1211, 1215, 51 L.Ed.2d 376 (1977)
> (standing). "And if the record discloses that
> the lower court was without jurisdiction this
> court will notice the defect, although the
> parties make no contention concerning it.
> [When the lower federal court] lack[s]
> jurisdiction, we have jurisdiction on appeal,
> not of the merits but merely for the purpose
> of correcting the error of the lower court in

> entertaining the suit." *United States v.*
> *Corrick*, 298 U.S. 435, 440, 56 S.Ct. 829, 831,
> 80 L.Ed. 1263 (1936) (footnotes omitted).

*Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986).

It does not follow, however, that every issue that might affect whether a case is properly brought before a particular tribunal involves subject matter jurisdiction. Instead, there are a great many other issues, such as personal jurisdiction, primary jurisdiction, and immunity, that, if properly raised by a party, may prevent a tribunal from proceeding. Those "jurisdictional" issues need not be raised by a court (or other tribunal) *sua sponte* and may be waived if not timely and properly asserted.

A state, for example, waives Eleventh Amendment immunity by voluntarily removing an action from state to federal court:

> As a basis for its holding, the *Lapides* Court
> [*Lapides v. Bd. of Regents*, 535 U.S. 613, 122
> S.Ct. 1640, 152 L.Ed.2d 806 (2002),] first
> examined decisions in which waivers of
> Eleventh Amendment immunity were found to be
> effected by a state's voluntary entry into
> litigation. *See Gardner v. New Jersey*, 329
> U.S. 565, 573-74, 67 S.Ct. 467, 91 L.Ed. 504
> (1947) (holding that when a state files a
> claim in bankruptcy court "it waives any
> immunity which it otherwise might have had
> respecting the adjudication of the claim");
> *Gunter v. Atl. Coast Line R.R. Co.*, 200 U.S.
> 273, 284-85, 289, 26 S.Ct. 252, 50 L.Ed. 477
> (1906) (holding that state participation in
> tax collection litigation waived Eleventh
> Amendment immunity); *Clark v. Barnard*, 108
> U.S. 436, 447, 2 S.Ct. 878, 27 L.Ed. 780
> (1883) (holding Eleventh Amendment immunity
> waived "by the voluntary appearance of the
> state in intervening as a claimant of the fund
> in court"). These cases, the Court explained,

> stood for the general principle that "'where a
> State *voluntarily* becomes a party to a cause
> and submits its rights for judicial
> determination, it will be bound thereby and
> cannot escape the result of its own voluntary
> act by invoking the prohibitions of the
> Eleventh Amendment.'" *Lapides*, 535 U.S. at
> 619, 122 S.Ct. 1640 (quoting *Gunter*, 200 U.S.
> at 284, 26 S.Ct. 252).

*Stewart v. North Carolina*, 393 F.3d 484, 489 (4th Cir. 2005).

Likewise, the doctrine of primary jurisdiction, under which a court defers to an administrative agency for a particular finding, is waivable by simple failure to assert it: "We noted recently that the doctrine of primary jurisdiction is applicable to proceedings in which an issue arises that is within the exclusive competence of the Railway Labor Act arbitrators, and that the application of the doctrine may – depending on legislative intent – be waivable by a party's failing to make a timely request for reference to the arbitrators." *Jackson v. Consol. Rail Corp.*, 717 F.2d 1045, 1059-1060 (7th Cir. 1983)(Posner, J., dissenting in part) (citing *In re Chi., Milwaukee, St. Paul & Pac. R.R.*, 713 F.2d 274, 282-283 (7th Cir. 1983)). *See also Holland v. Delray Connecting R.R. Co.*, 311 F.Supp.2d 744, 746-48 (N.D.Ind. 2004)("'Subject matter' jurisdiction of a court means its power to hear a case. It is distinct from the concept of 'primary jurisdiction.'").

Different types of jurisdictional issues are sometimes difficult to label. In *Constantine v. Rectors & Visitors of George Mason University*, 411 F.3d 474, 480-82 (4th Cir. 2005), the court

grappled with the interplay of subject matter jurisdiction, personal jurisdiction, and immunity.   The opinion begins by recognizing the nature of the subject matter jurisdiction requirement:

> "Subject-matter jurisdiction . . . is an [Article] III as well as a statutory requirement; it functions as a restriction on federal power, and contributes to the characterization of the federal sovereign." *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982). Because a federal court's subject-matter jurisdiction is created-and limited-by Article III and federal statutes, "no action of the parties can confer subject-matter jurisdiction upon a federal court," and ordinary principles of consent, waiver, and estoppel do not apply. *Id.*   A federal court has an independent obligation to assess its subject-matter jurisdiction, and it will "raise a lack of subject-matter jurisdiction on its own motion." Id. Because subject-matter limitations "serve institutional interests," they "must be policed by the courts on their own initiative even at the highest level." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999).

*Constantine*, 411 F.3d at 480.   The court then distinguished personal jurisdiction:

> Personal jurisdiction differs from subject-matter jurisdiction in that it reflects an individual liberty interest rather than an institutional interest; thus, "a party may insist that the limitation be observed, or he may forgo that right, effectively consenting to the court's exercise of adjudicatory authority." [*Ruhrgas*, 526 U.S.] at 584, 119 S.Ct. 1563. The simple fact that subject-matter jurisdiction is nonwaivable, while personal jurisdiction may be waived,

> does not mean that subject-matter jurisdiction is somehow more fundamental: "The validity of an order of a federal court depends upon that court's having jurisdiction over *both* the subject matter and the parties." *Insurance Corp.*, 456 U.S. at 701, 102 S.Ct. 2099 (emphasis added). Thus, a federal court may decide a straightforward question concerning personal jurisdiction without first determining that it has subject-matter jurisdiction over the case. *Ruhrgas*, 526 U.S. at 588, 119 S.Ct. 1563.

*Constantine*, 411 F.3d at 480. The next step was to consider immunity:

> As the Court has interpreted and applied it, Eleventh Amendment immunity has attributes of both subject-matter jurisdiction and personal jurisdiction. The text of the Eleventh Amendment suggests a limitation on subject-matter jurisdiction: "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. *See also Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (stating that the "greater significance [of the Eleventh Amendment] lies in its affirmation that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III"). Like other issues relating to subject-matter jurisdiction, Eleventh Amendment immunity may be asserted at any time in litigation. *Edelman* [*v. Jordan*], 415 U.S. [651] at 678, 94 S.Ct. 1347 [(1974)] (stating that "the Eleventh Amendment defense sufficiently partakes of the nature of a jurisdictional bar so that it need not be raised in the trial court"); *In re Creative Goldsmiths of Washington, D.C., Inc.*, 119 F.3d 1140, 1144 (4th Cir. 1997) (considering an Eleventh

22

Amendment defense raised for the first time on appeal).

Like personal jurisdiction, however, Eleventh Amendment immunity need not be raised by a court *sua sponte*, *Patsy v. Board of Regents of Fla.*, 457 U.S. 496, 515 n.19, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982),[3] and may be waived by the State altogether, *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 238, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985) (stating that "if a State waives its immunity and consents to suit in federal court, the Eleventh Amendment does not bar the action"); *Clark v. Barnard*, 108 U.S. 436, 447, 2 S.Ct. 878, 27 L.Ed. 780 (1883) (characterizing the State's sovereign immunity as "a personal privilege which it may waive at pleasure"). For example, the Court has consistently held that a State's voluntary appearance in federal court effects a waiver of Eleventh Amendment immunity. *Lapides v. Board of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 624, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002); *Gardner v. New Jersey*, 329 U.S. 565, 574, 67 S.Ct. 467, 91 L.Ed. 504 (1947); *Gunter v. Atlantic Coast Line R.R. Co.*, 200 U.S. 273, 284, 26 S.Ct. 252, 50 L.Ed. 477 (1906); *Clark*, 108 U.S. at 447, 2 S.Ct. 878. Given the potential for waiver, the Court has stated that the Eleventh Amendment "does not automatically destroy original jurisdiction. Rather, the Eleventh Amendment grants the State a legal power to assert a sovereign immunity defense should it choose to do so." *Wisconsin Dep't of Corr. v. Schacht*, 524 U.S. 381, 389, 118 S.Ct. 2047, 141 L.Ed.2d 364 (1998); *see also Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 267, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997) ("The Amendment, in other words, enacts a sovereign immunity from suit, rather than a nonwaivable limit on the Federal Judiciary's subject-matter jurisdiction.").

---

[3.] The Supreme Court has made it clear that federal courts are not *required* to raise Eleventh Amendment issues *sua sponte*. *See*

> *Schacht*, 524 U.S. at 389, 118 S.Ct. 2047 ("Nor
> need a court raise the defect on its own.
> Unless the State raises the matter, a court
> can ignore it.").  We have stated in dicta,
> however, that "because of its jurisdictional
> nature, a court ought to consider the issue of
> Eleventh Amendment immunity at any time, even
> sua sponte." *Suarez Corp. Indus. v. McGraw*,
> 125 F.3d 222, 227 (4th Cir. 1997).

*Constantine*, 411 F.3d at 480-81.

Finally, the court acknowledged that clear definition of any particular concept may not always be possible:

> Difficult as it may be to describe precisely
> the nature of Eleventh Amendment immunity, *see*
> *Schacht*, 524 U.S. at 394, 118 S.Ct. 2047
> (Kennedy, J., concurring) (noting the "hybrid
> nature" of the Eleventh Amendment), it is at
> least clear that this immunity is not the kind
> of Article III limitation on subject-matter
> jurisdiction that the Court considered in
> *Steel Co.* [*v. Citizens for a Better Env't*, 523
> U.S. 83 (1998)].   Thus, we reject the
> defendants' contention that *Steel Co.* required
> the district court to consider Eleventh
> Amendment questions before addressing the
> sufficiency of the allegations under Rule
> 12(b)(6).   *See In re: Hechinger Inv. Co. of*
> *Del., Inc.*, 335 F.3d 243, 249-51 (3rd Cir.
> 2003); *United States v. SCS Bus. & Technical*
> *Inst., Inc.*, 173 F.3d 890, 891 (D.C.Cir.
> 1999); *Parella v. Retirement Bd. of R.I.*
> *Employees' Ret. Sys.*, 173 F.3d 46, 53-57 (1st
> Cir. 1999); *but see United States v. Texas*
> *Tech Univ.*, 171 F.3d 279, 285-86 (5th Cir.
> 1999); *Seaborn v. Florida Dep't of Corr.*, 143
> F.3d 1405, 1407 (11th Cir. 1998).

*Constantine*, 411 F.3d at 482.

CXST's contention that the jurisdiction of the NRAB - in these cases - was superseded by that of the STB is more like an issue of immunity or personal jurisdiction than one of subject matter

jurisdiction.  Without question, the NRAB has the power to resolve minor disputes under existing CBAs generally.  On the other hand, a railroad may be exempt or immune from complying with the law governing CBAs, if, and only if, the superseding provisions of the ICA apply.  Because the proper arbitral forum depends on the characterization of the parties' dispute, the issue likely is not one of subject matter jurisdiction, but more a type of personal exemption of the railroad from being held accountable in a particular forum for an alleged wrong:

> It is firmly established, however, "that the absence of a valid (as opposed to arguable) cause of action does not implicate subject matter jurisdiction, *i.e.*, the court's statutory or constitutional *power* to adjudicate the case." *See Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 122 S.Ct. 1753, 1758, 152 L.Ed.2d 871 (2002) (internal quotation marks and citations omitted); *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (explaining that "if the right of the petitioners to recover under their complaint will be sustained if the . . . laws of the United States are given one construction and will be defeated if they are given another", the district court has subject matter jurisdiction).  Virginia Power's assertion that the CSB order is not "an order of the Commission," therefore, does not implicate subject matter jurisdiction.

*Cavalier Tel., L.L.C. v. Va. Elec. & Power Co.*, 303 F.3d 316, 320 n.6 (4th Cir. 2002).

CSXT's conduct in invoking the power of the NRAB to resolve these claims, and its voluntary participation in the claim

initiated by TCU, is entirely inconsistent with an assertion that it is immune from complying with the CBAs in issue.[17]   In 05-419, CSXT did not raise the jurisdictional issue below at all, and in 05-2511, raised the issue only after the entire proceeding was complete, but for a decision by the arbitrator.   In short, CSXT waived any immunity it might have enjoyed.   Even had CSXT not waived any immunity, moreover, the court finds its position without merit.

## 2.  Jurisdiction of the NRAB

Here, the ICA does not supercede other law, including the RLA and the SCL-TCU CBA, when the Supreme Court's reasoning in *Train Dispatchers,* 499 U.S. at 119, is applied.   The key issue in this case is whether CSXT violated the SCL-TCU CBA when it allowed employees outside the CSC in Jacksonville to perform certain tasks. In the Benn arbitrations, CSXT argued at the administrative level that it did not violate the SCL-TCU agreement because the tasks at issue were "shared" and were not transferred to the CSC via the 1991 Implementing Agreement; thus there could be no violation of the local CBA when employees outside of the CSC performed the tasks.   Likewise, in the Wesman arbitration, CSXT asserted that the task at issue had "always been performed" by clerks in the field,

---

[17] CSXT knows how to invoke the New York Dock provisions when appropriate, *see* (JE 1, Award no. 37235, at 10).

was not transferred to the CSC, and thus the SCL-TCU CBA was not violated.[18]

In the initial award, Arbitrator Benn articulated a three-part test to determine whether the tasks at issue were transferred: (a) was the task performed by someone other than a customer service representative at the CSC; (b) was the task performed by a clerk at the specific location in dispute before the 1991 Implementing Agreement took effect; and (c) was the task performed by a customer service representative at the CSC after the 1991 Implementing Agreement took effect. (JE 1, Award no. 37227, at 15). To the extent that TCU could make all three showings, Arbitrator Benn concluded it could establish that the task at issue was clerical work that was transferred to the CSC by virtue of the Implementing Agreement and thus fell under the SCL-TCU CBA. And, under the terms of the CBA's Scope rule, any work covered under the CBA could not be removed from the customer service representatives in Jacksonville without separate agreement. Thus, if employees outside of customer service representatives at the CSC performed the work without separate agreement, CSXT was in violation of the CBA. Arbitrator Benn applied this test in the subsequent awards, and found that CSXT violated the CBA in eight of the ten cases.

---

[18] CSXT also argued that TCU's claim should be denied because TCU failed to specify a "claimant" and, even if there was a CBA violation, TCU's claim for compensation was disproportionate to the actual time spent on the task. Neither argument was successful.

Likewise, Arbitrator Wesman applied the Benn test in the subsequent arbitration and found that CSXT violated the CBA.  (No. Civ. A. DKC 2005-2511, Paper 1, ex. 1).

There is no question that the NRAB has jurisdiction to decide "minor disputes" related to existing CBAs, if the STB provisions do not apply.  The controversies at issue here are garden-variety "minor disputes" regarding work assignment.  *See Slocum v. Del., L. & W.R. Co.*, 339 U.S. 239, 244 (1950) (holding that the NRAB had exclusive jurisdiction to resolve a work assignment dispute involving existing CBAs).  Hence, their resolution is well within both the basic jurisdiction and the expertise of the NRAB.  The mere fact that Arbitrator Benn referenced the 1991 Implementing Agreement to inform his analysis of whether the CBA was violated does not necessarily mean that the merger itself is being challenged, and it is not sufficient to strip the NRAB's jurisdiction of this CBA dispute, or supercede the application of the RLA.[19]  To the extent that Arbitrator Benn and Arbitrator Wesman found that the work was transferred and that CSXT violated the CBA, they had jurisdiction to make this determination and any merit-

---

[19] Moreover, in Arbitrator Benn's three-part test, he does not actively interpret what the Implementing Agreement meant, but instead looks to what actually transpired.  In other words, to determine if the work was transferred, Arbitrator Benn examined whether it was actually performed at the CSC following the consolidation.  Likewise, Arbitrator Wesman applied the same three-part test and, other than in the articulation of that test, made no reference to the Implementing Agreement.

based challenge is foreclosed under the limited review powers of this court.

In order for the arbitration awards to be rendered invalid, CSXT must show that the CBA was superceded by the ICA.   The preclusive powers of the ICA are not unlimited.   As the Supreme Court noted in *Train Dispatchers*, exemption from other laws is only allowed when it is "*necessary to carry out an ICC-approved transaction.*"   499 U.S. at 132-33 (emphasis added).   In order to argue that the ICA governs, CSXT must be able to assert that (a) if the work was in fact transferred to  Jacksonville under the Implementing Agreement, then (b) regardless of the CBA, it was still entitled to transfer the work from the CSC because performance of the disputed tasks in the field was "necessary" to carry out the merger and/or the consolidation of customer service functions in Jacksonville.   Only then could this court find that the ICA governed and that the parties were required to arbitrate the dispute pursuant to the ICA procedures/New York Dock provisions.   *See Harris v. Union Pac. R.R.*, 141 F.3d 740, 743 (7th Cir. 1998) ("Only laws that would block the transaction give way" and are superceded by the ICA.).

Although the Supreme Court did not define the term "necessary" in *Train Dispatchers*, the ICC has stated that the ICA supercedes other law where there otherwise will be an impediment to the merger.   *CSX Corp. – Control – Chessie Sys., Inc., and Seaboard*

*Coast Line Indus., Inc.*, 8 I.C.C.2d 715, 721-22 (1992) ("[T]he necessity predicate is satisfied by a finding that some 'law' (whether antitrust, RLA, or a collective bargaining agreement formed pursuant to the RLA) is an impediment to the approved transaction. In other words, the necessity predicate assures that the exemption is no broader than the barrier which would otherwise stand in the way of implementation."). *See also Am. Train Dispatchers Ass'n v. ICC*, 26 F.3d 1157, 1161 (D.C. Cir. 1994), *abrogated on other grounds*, *Rio Grande Pipeline Co. v. F.E.R.C.*, 178 F.3d 533, 536 (D.C. Cir. 1999) (discussing the ICC's interpretation of necessity).

CSXT has not argued, either below or in this court, that where these particular tasks are performed is a critical factor that could impede the merger or the CSC consolidation.[20] In fact, there is no question that both the merger and the consolidation of clerical functions at the CSC have already taken place. CSXT's arguments, taken to their logical end, would mean that no CBA work assignment dispute involving transferred work could ever be brought before the NRAB following a merger, because each would always require reference to an Implementing Agreement. This surely was not the result that Congress envisioned; at some point, the STB's purview over a merger must end. *See Holland v. Delray Connecting*

---

[20] Nor would it appear that CSXT genuinely could make this argument now, given that it has voluntarily resolved these disputes using the NRAB process since 1994.

*R.R. Co.*, 311 F.Supp.2d 744, 749 (N.D.Ind. 2004) ("[J]ust as a bankruptcy court's control over a debtor ends once a reorganization plan is confirmed, '[s]o too with decisions by the Commission or [Surface Transportation] Board approving mergers.'")(quoting *Harris*, 141 F.3d at 744).

Moreover, the New York Dock arbitration provisions were put in place for the railroad to avoid lengthy NRAB processes concerning major disputes and to facilitate efficient mergers and consolidations; none of these policy rationales are relevant here. The parties have already gone through the NRAB process and resolution has been reached. And, perhaps more importantly, the consolidation has already been accomplished. Conversely, the policies underlying the RLA confirm that the NRAB was the proper forum for resolution of these matters. These disputes are exactly the type of "daily grievances" that the Supreme Court envisioned when it stated that the NRAB's effectiveness in ensuring stability in the railroad industry depends on the "finality of its determinations." *Union Pac. R.R. Co. v. Sheehan*, 439 U.S. 89, 94 (1978). *See also Ry. Labor Executives' Ass'n v. Pittsburgh & Lake Erie R.R. Co.*, 845 F.2d 420, 423 (3rd Cir. 1988), *reversed on other grounds, Pittsburgh & Lake Erie R.R. Co. v. Ry. Labor Executives' Ass'n*, 491 U.S. 490 (1989) (stating that the judiciary "must reconcile the [RLA and the ICA] as much as possible and attempt to reach a result that will produce the minimum possible conflict with

congressional intent."); *Landis v. Burlington N. R.R. Co.*, 930 F.2d 748, 752 (9th Cir. 1991) (noting the ICC's policy of refraining from unnecessarily interfering in labor relations).

Work assignment disputes involving the CSC have been resolved under the NRAB process since 1994. Moreover, all but one of the current disputes were voluntarily submitted by CSXT to the NRAB. CSXT is unhappy with the outcome reached and now, under the guise of a jurisdictional argument, is attempting to obtain a different result. CSXT's assertions are without merit and ultimately lose sight of both the ICA's statutory text and its purpose. Accordingly, CSXT's petition to vacate the arbitration awards will be denied.

## IV. UTU's Participation Claim

UTU asserts that the NRAB violated the RLA by not allowing UTU to participate as a "full party" in the Benn arbitrations. Thus, UTU contends the Benn awards should be vacated. There is no dispute that UTU was provided with notice of the arbitrations, and allowed to file a written submission and present oral arguments. UTU argues, however, that it was denied full participation rights because it was not allowed to attend the Executive session held after the hearings, and it was not given voting rights. UTU's claims are without merit.

The RLA provides that the Third division "shall consist of ten members, five of whom shall be selected by the carriers and five by

the national labor organizations of employees."  45 U.S.C. § 153 First(h).  Any division may "empower two or more of its members to conduct hearings and make findings upon disputes."  45 U.S.C. § 153 First(k).  For an award to be final, a majority vote of all members of the division is required.  With regard to participation rights, the RLA provides: "Parties may be heard either in person, by counsel, or by other representatives, as they may respectively elect, and the several divisions of the Adjustment Board shall give due notice of all hearings to the employee or employees and the carrier or carriers involved in any disputes submitted to them."  45 U.S.C. § 153 First(j).

Where there is a labor dispute regarding work assignment that involves a second union, the Supreme Court has held that the second union must be given "an opportunity to be heard."  *Transp.-Commc'n Employees Union v. Union Pac. R.R.*, 385 U.S. 157, 165 (1966).  Following the Supreme Court's decision, the Fourth Circuit held: "[U]ntil the record discloses whether the Board has taken into account the competing union's contract, it cannot be said that the mandate of *Transportation-Communication* has been complied with."  *Bhd. of R.R. Signalmen of Am. v. S. Ry. Co.*, 380 F.2d 59, 65 (4th Cir. 1967).

UTU points to no statutory provision that the NRAB violated.  Instead, UTU relies on an Eighth Circuit case to support its contention that an "opportunity to be heard" includes participation

in Executive sessions and voting rights.   UTU's reliance is
misplaced.   In *Brotherhood of Locomotive Engineers International
Union v. Union Pacific Railroad Co.*, 134 F.3d 1325, 1333 (8th Cir.
1998), the court held that pursuant to the RLA, BLE, a union that
was "involved" in a labor dispute between Union Pacific and UTU,
was entitled to participate as a member of the Public Law Board
that had been established by Union Pacific and UTU.[21]   However, the
court emphasized that its conclusion was based entirely on Eighth
Circuit precedent to which it felt bound:

> This precedent compels us to conclude that the
> BLE was entitled to participate as a member of
> the [Public Law Board].   Our [prior] opinions
> . . . indicate that both unions have a right
> to representation on the board where the
> dispute involves a contract provision common
> to both unions' CBAs with the same carrier,
> even if the contract dispute initially arose
> between the rail carrier and but one of the
> unions over the contract provision.   Our own
> reading of the [RLA] leaves us somewhat
> discomforted by this resolution because the
> plain language of the second paragraph of 45
> U.S.C. § 153 Second seems to envision only a
> three-person PLB.   Nevertheless, because our
> panel is not at liberty to overrule another
> panel decision, we are compelled to follow the
> reasoning of [our prior decisions], which
> reasoning indicates that the BLE was not
> obligated to accept its designation as a third
> party but had a right to full membership on
> the [Public Law Board].

---

[21]   Interestingly, in that case, UTU adopted the opposite
position of what it advocates here, and argued that the RLA did not
give BLE a right to participate as a member of the Board.

*Bhd. of Locomotive Eng'rs Int'l Union v. Union Pac. R.R. Co.*,134 F.3d at 1333.   This court is not bound by Eighth Circuit law, nor does it find this case persuasive.   No provision of the RLA requires the NRAB to allow UTU to participate in an Executive session or to vote.   In addition, allowing UTU voting rights may frustrate an express statutory purpose, "to provide for the prompt and orderly settlement of all disputes," because a four-member Board may likely deadlock.   *See* 45 U.S.C. § 151(a).

UTU was given "an opportunity to be heard."   *See Transp.- Commc'n Employees Union v. Union Pac. R.R.*, 385 U.S. at 165.   UTU was provided with notice of the work assignment disputes and was allowed to file a written submission and to make oral arguments at the arbitration hearing.   Moreover, in accordance with *Brotherhood of Railroad Signalmen*, 380 F.2d at 65,   Arbitrator Benn expressly considered UTU's CBA in his analysis and noted the impact the awards would have on UTU and its members.   (JE 1, Award No. 37227, at 15-16).   Accordingly, UTU's motion for summary judgment will be denied.[22]     Having rejected the arguments of CSXT and UTU, TCU's counterclaim to enforce the eight Benn awards and the Wesman award will be granted.

---

[22] Because the court finds that UTU had no right to participate in the Executive session or to vote, it need not consider the declaration of Mr. Cumby.   Thus, UTU's motion for leave to file the declaration will be denied as moot.

## V. Conclusion

For the foregoing reasons, the court will grant TCU's motion for summary judgment. The court will deny UTU and CSXT's motions for summary judgment, and will deny, as moot, UTU's motion for leave to file Mr. Cumby's declaration.

The exact nature of the judgment to be entered on the counterclaim to enforce the awards is not clear from the record and the parties will be directed to submit a proposed form, by agreement, if possible. There are also two claims for relief in the counterclaim that bear mention, although the parties have not discussed them in their motions. In addition to enforcement of the awards, TCU seeks both attorneys' fees and prejudgment interest. The RLA states that if a union petitions for enforcement of a NRAB award and prevails, it is entitled to a "reasonable attorney's fee." 45 U.S.C. § 153 First(p). Moreover, even where a carrier initially submits the dispute for review under 45 U.S.C. § 153 First(q), which does not provide for attorneys' fees, and the union counterclaims for enforcement, a court will still award fees if the union prevails. *See Norfolk & W. Ry. Co. v. Bhd. of Ry, Airline and S.S. Clerks, Freight Handlers, Express & Station Employees*, 657 F.2d 596, 604 (4th Cir. 1981) (noting that in seeking review, the carrier opened itself up to the possibility that the union would also seek enforcement, and if successful, be entitled to attorneys' fees); *Burlington N. Inc. v. Am. Ry. Supervisors Ass'n*, 527 F.2d

216, 222-223 (7th Cir. 1975) (discussing 45 U.S.C. § 153 First(p) and noting that the policies underlying the provision apply "whether the request for court-ordered compliance is made by way of a separate action or by means of a counterclaim to a petition for review).  Accordingly, it appears appropriate to grant TCU reasonable attorneys' fees pursuant to 45 U.S.C. § 153 First(p). TCU is directed to file a properly supported petition to support its fees.

TCU also asks this court to award prejudgment interest, but its request is unsupported.  Moreover, neither the RLA nor the NRAB awards provide for the payment of prejudgment interest.  *See Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Trans World Airlines*, 972 F.Supp. 503, 507 (E.D.Mo. 1997) (declining request to award prejudgment interest where the arbitration award did not provide for it); *Pompeo v. Erie-Lackawanna R.R. Co.*, 346 F.Supp. 1311, 1315 (W.D.N.Y. 1972) (noting that the RLA does not provide for prejudgment interest).  Hence, the award of prejudgment interest is within the discretion of this court, to be determined according to judge-made principles.  *Milwaukee v. Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, 194 (1995).  *See also Moore Bros. Co. v. Brown & Root, Inc.*, 207 F.3d 717, 727 (4th Cir. 2000) ("District courts must weigh the equities in a particular case to determine whether an award of prejudgment interest is appropriate.").

A bona fide controversy existed between TCU and CSXT regarding who was permitted to perform certain work tasks. There was also uncertainty as to how much compensation CSXT owed, in the event the arbitrator found the SCL-TCU CBA was violated. (JE 1, Award no. 37227 (stating that TCU sought eight hours "at the applicable rate of $147.14 or the punitive rate, if applicable," but awarding TCU $15.00 per claim)). Under these circumstances, an award of prejudgment interest is not warranted, and TCU's request will be denied. *See Moore Bros. Co.*, 207 F.3d at 727; *United States v. West Virginia*, 764 F.2d 1028, 1031 (4th Cir. 1985) ("Under the federal rule, interest is allowable as a matter of right for a breach of contract to pay when the amount due has been liquidated, ascertained, or agreed to.").

A separate Order will follow.


_____/s/_____
DEBORAH K. CHASANOW
United States District Judge

February 6, 2006